People v N.H.

2026 NY Slip Op 02437

April 23, 2026

Court of Appeals

Rivera, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This decision is uncorrected and subject to revision before publication in the Official Reports.

The People & c., Respondent,

v

N.H., Appellant.

Decided on April 23, 2026

No. 34

Paris C. DeYoung, for appellant.

Jean M. Joyce, for respondent.

Survivors Justice Project et al., Roxanne J. Persaud et al., The Legal Aid Bureau of Buffalo, Inc. et al., amici curiae.

Rivera, J.

[*1]

The issue on appeal is whether, as a condition of a negotiated plea agreement, a defendant may waive a Penal Law § 60.12 hearing to determine their eligibility for an alternative sentence under the Domestic Violence Survivors Justice Act (DVSJA). The Legislature designed the DVSJA's alternative sentencing framework to remedy a systemic injustice of the criminal legal system. Specifically, the Legislature recognized that the standard sentencing scheme fails to adequately consider how domestic violence impacts a survivor defendant's criminal conduct, and their potential for rehabilitation, resulting in harsh and unfair sentences for many survivors. The DVSJA, in Penal Law § 60.12, provides a survivor defendant with the opportunity to request a hearing to establish the impacts of domestic violence in their case and their eligibility for a lesser sentence that accords with the legislative purpose of fair and compassionate treatment of survivors.

Here, defendant N.H. requested a reduced sentence under the DVSJA sentencing framework or, in the alternative, a section 60.12 hearing to demonstrate her eligibility for such a sentence. The prosecution subsequently offered, and N.H. accepted, a plea bargain contingent on N.H.'s waiver of a section 60.12 hearing. We hold that section 60.12 hearings are not waivable as a condition of a plea agreement. Therefore, we reverse the Appellate Division order and remit to Supreme Court for further proceedings.

I.

The DVSJA

Enacted in 2019, the DVSJA amended Penal Law § 60.12 to establish an alternative sentencing framework for certain defendants who are survivors of domestic violence. We recently explained that "[t]he Legislature enacted the DVSJA in recognition of the 'national epidemic' of domestic violence and the failure of prior law to 'allow judges discretion to fully consider the impact of domestic violence' in making sentencing determinations" (People v Brenda WW., 44 NY3d 594, 598 [2025], quoting Assembly Mem in Support, Bill Jacket, L 2019, ch 31, at 6 [hereinafter "Assembly Mem"]). To that end, the DVSJA "expand[s] judicial discretion at . . . the initial sentencing stage" by permitting "courts to sentence defendants to an alternative, less severe sentence" (id.). The reduced sentencing ranges available under the statute include "determinate sentences and, in some cases, community-based alternative-to incarceration program[s]" (Assembly Mem, at 6; see Penal Law § 60.12). As amended, Penal Law § 60.12 now provides that where a defendant has been convicted of an eligible offense and is pending sentencing, a judge may impose a sentence pursuant to the alternate DVSJA framework "upon a determination following a hearing" that (1) "at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of [their] family or household . . . as such term is defined in [CPL 530.11 (1)]"; (2) "such abuse was a significant contributing factor to the defendant's criminal behavior"; and (3) a sentence within the standard range provided by law "would be unduly harsh" considering "the nature and circumstances of the crime and the history, character and condition of the defendant" (Penal Law § 60.12 [1]; see also Assembly Mem, at 5). The statute also provides that "the [hearing] court shall consider oral and written arguments, take testimony from witnesses offered by either party, and consider relevant evidence to assist in making its determination," and that "[r]eliable hearsay shall be admissible" (Penal Law § 60.12 [1]). Thus, the DVSJA requires a court to consider a defendant's history of domestic violence and its impact on their criminal behavior prior to imposing sentence, whether it ultimately opts to sentence the defendant under the standard Penal Law article 70 sentencing scheme or the alternative DVSJA sentencing framework. This structure deliberately furthers the statutory purpose of permitting judges to adequately consider a survivor's history to impose an appropriate sentence.

The DVSJA's legislative history reflects that prior to enactment, despite "significant advances," New York had failed to "reform[ ] the unjust ways in which the criminal justice system responds to and punishes domestic violence survivors who act to protect themselves from an abuser's violence" (Assembly Mem, at 6). The narrow scope of the previous sentencing law for defendants who had experienced domestic violence—the Sentencing Reform Act of 1998, commonly referred to as "Jenna's Law"—constrained the sentencing judge's ability to fully consider how survivors' histories of domestic violence may have contributed to their commission of the offense (see Tamar Kraft-Stolar et al., From Protection to Punishment: Post-Conviction Barriers to Justice for Domestic Violence Survivor-Defendants in New York State at 11-12, Avon Global Center for Women and Justice at Cornell Law School and The Women in Prison Project of the Correctional Association of New York, Scholarship@Cornell Law: A Digital Repository [Jun. 1, 2011], available at https://scholarship.law.cornell.edu/avon_clarke/2/ [last accessed Apr. 8, 2026]; Assembly Mem, at 6 [asserting that the DVSJA "would address shortcomings" in the rarely-used Jenna's Law, which "state officials [had] thought . . . would lead to less punitive sentencing for survivors (but) [*2]unfortunately . . . did not"]).FN1 The DVSJA created an alternative sentencing process intended to address these systemic defects by enabling sentencing judges to comprehensively consider, after a hearing, the effects of domestic abuse on a defendant's criminal conduct, and to take such effects into account when making sentencing determinations (see Assembly Mem, at 6 [describing the "problem" the DVSJA intended to "address" as the "harsh punishment(s)" imposed on domestic abuse survivors, much of which are a "result of our (S)tate's current sentencing structure(,) which does not allow judges discretion to fully consider the impact of domestic violence when determining sentence lengths"]). The Legislature sought to "decrease the likelihood of survivors being victimized by the very system that should help protect them," through "long, unfair prison sentences" (see id. at 6, 7). Thus, with the DVSJA's enactment, the Legislature reenvisioned a fairer system of justice in which judges respond to qualifying survivors with "compassion and assistance" in the form of reduced prison sentences and non-incarceratory alternatives (see id. at 5-7).

II.

Factual and Procedural History

The prosecution charged N.H. with, among other offenses, one count of attempted murder in the second degree and two counts of assault in the first degree, arising from an incident at a party outside N.H.'s home. After N.H.'s abusive ex-boyfriend, R.L., arrived at the party, an altercation broke out during which N.H.'s then-boyfriend was injured, and N.H. fled to her car to escape her former abuser. As she began driving away, she hit and ran over her sister's girlfriend. When she reversed, N.H. ran over the victim's body again and then drove forward, striking the victim three times before dragging her body down the street under the car. The victim survived but is permanently paralyzed.

While the case was pending, N.H.'s counsel submitted an application to the court requesting that it sentence N.H. under the DVSJA to six months' incarceration followed by five years' probation, or grant a hearing pursuant to Penal Law § 60.12 to determine her eligibility for a reduced DVSJA sentence. Counsel supported the request with numerous scholarly articles on domestic violence and women in the criminal legal system, and the psychological effects of trauma and domestic violence. Counsel also submitted reports from a licensed psychologist and a forensic social worker, both conducted after N.H.'s arrest and based on interviews with N.H., her family members, and her service providers, as well as relevant documents. The psychologist also administered a diagnostic clinical assessment for Post-Traumatic Stress Disorder (PTSD) during N.H.'s pre-trial incarceration.

The psychologist's report details N.H.'s self-disclosed exposure to domestic violence, which began as a child when N.H. witnessed her mother's boyfriend repeatedly punch her. Then, as an adult, N.H. experienced repeated psychological and physical abuse by R.L., the father of her child. According to N.H., R.L. first physically assaulted her when she was 20 years old and five months pregnant, and his physical and verbal abuse escalated thereafter. After a period of separation due to the first incident of physical abuse, they resumed their relationship when their child was around one year old, and N.H. moved into R.L.'s apartment. Their relationship quickly became volatile again, leading to repeated breakups and reconciliations. Each [*3]time, R.L. would become physically and verbally abusive. N.H. stated that as this pattern continued, she understood their relationship was "toxic." She ended the relationship permanently when she was about 25 years old, approximately two or three years before the incident leading to her arrest.

The psychologist's report also recounted N.H.'s narrative of the events at the party, including that N.H. hit the victim with her car while trying to escape from R.L. and what she perceived as a threat to her physical safety. According to the psychologist, N.H. "described an extremely chaotic situation" at the party before she ran to her car, including R.L. jumping on top of her and punching her, "as he had in the past," and "that she wanted desperately to get out from underneath [him]." Once N.H. got into her car, R.L. and N.H.'s sister were banging on the windows, and N.H. "stated that 'the car went from feeling like a super safe spot to feeling like I could die in there.' " The psychologist found N.H.'s account to be credible, detailed, and "highly consistent" with her sister's report and other available sources, and noted that N.H.'s "description of the incident [leading to the criminal charges] suggests that her emotional reaction at that time may well have been impacted by her history of exposure to trauma and violence." The report concluded that N.H.'s "symptom presentation is consistent with a diagnosis of [PTSD]," and noted that her scoring protocol reporting posttraumatic symptoms did not reflect an attempt to "feign symptoms or 'malingering.' " The psychologist described N.H. as "resilient" and stated that she "displays insight and the capacity for self-reflection, suggesting amenability for treatment." Further, N.H. "appeared to be benefitting" from various therapy and counseling services since the incident, had "a stable educational and employment history[,] and ha[d] been able to support herself and her daughter" in the past. The psychologist opined that earlier therapeutic services might have helped N.H. "identify ways to interrupt the cycle of volatility between" her and R.L., but that she had gained "considerable insight through therapy, both about the ways in which her life experiences have impacted her and about her emotional reactions." The psychologist recommended that N.H. continue trauma-focused psychotherapy.

The forensic social worker conducted a biopsychosocial assessment and report to provide the court and District Attorney's office with "a better understanding of [N.H.'s] traumatic history/triggers [that] have directly contributed to her current circumstances." The report stated that N.H.'s "extensive history of abuse has played a major role [in] her daily living and has significantly impacted her behavior[al] response to perceived threats and violence." Noting N.H.'s support network, her "extensive domestic violence history," and her efforts to "address her mental health challenges" through clinical and therapeutic services, the report concluded that "it would be unduly harsh for [N.H.] to be sentenced under the standard sentencing scheme," because it would "have a devastating impact on her life and her healing progress thus far, in addition to and most significantly for her daughter." The social worker recommended that N.H. be sentenced under the DVSJA.

While N.H.'s DVSJA application was pending and before any Penal Law § 60.12 hearing, the prosecution offered, and N.H. accepted, a plea bargain in exchange for her waiver of the hearing and her right to appeal. Pursuant to the agreement, N.H. pleaded guilty to one count of first-degree reckless assault (Penal Law § 120.10 [3]), in full satisfaction of the indictment, in exchange for a determinate sentence of five years' imprisonment followed by five years' post-release supervision (PRS). During the plea proceeding, defense counsel argued that N.H. was entitled to the hearing and that asking her to waive it went "against the spirit of why the law was created."FN2 The court, noting the absence of caselaw in this area, also expressed [*4]concern as to whether a defendant may waive a DVSJA hearing as a condition of a negotiated plea agreement, but ultimately concluded that such a hearing was waivable. The court accepted N.H.'s plea and imposed the promised sentence.

The Appellate Division affirmed, concluding that section 60.12 hearings are waivable as part of a plea agreement, and that the five-year period of PRS imposed was not excessive in this case (232 AD3d 200, 201, 208 [2d Dept 2024]). A Judge of this Court granted N.H. leave to appeal (42 NY3d 1080 [2025]).FN3

III.

A Penal Law § 60.12 Hearing Is Not Waivable as a Plea Condition

N.H.'s sole contention on appeal is that Penal Law § 60.12 hearings are nonwaivable and that she is therefore entitled to such a hearing to determine her eligibility for DVSJA relief. We agree. The statutory framework and purpose of the DVSJA alternative reduced sentencing framework reveal the Legislature's intent to mitigate a systemic failure of the criminal legal system, which led to unduly harsh sentencing of domestic violence survivors.

A.

"The primary consideration of courts in interpreting a statute is to ascertain and give effect to the intention of the Legislature" (People v Galindo, 38 NY3d 199, 203 [2022] [internal quotation marks omitted]). "As the clearest indicator of legislative intent is the statutory text, the starting point in any case of interpretation must always be the language itself, giving effect to the plain meaning thereof" (Majewski v Broadalbin-Perth Cent. Sch. Dist., 91 NY2d 577, 583 [1998]). "A statute must be construed as a whole, and its various sections must be considered together and with reference to each other" (Matter of Peyton v New York City Bd. of Stds. & Appeals, 36 NY3d 271, 280 [2020] [internal quotation marks omitted]). "[I]n appropriate circumstances, the Court may inquire into the purpose of the legislation, which requires examination of the statutory context of the provision as well as its legislative history" (id. [internal quotation marks and alternations omitted]). We consider legislative history "where the language [of the statute] is ambiguous or where a literal construction would lead to absurd or unreasonable consequences that are contrary to the purpose of the enactment" (see Matter of Auerbach v Bd. of Ed. of City Sch. Dist. of City of N.Y., 86 NY2d 198, 204 [1995]).

B.

While it is undisputed that a defendant may agree to forgo many of their rights, "even very important ones," during the course of plea negotiations, some rights are "too valuable, both to the [defendant] and to the community, to be sacrificed in plea bargaining" (see People v Rudolph, 21 NY3d 497, 501 [2013]). "Plea bargaining is . . . a vital part of our criminal justice system," but "[t]he judicial acceptance of plea bargaining . . . rests upon broader policy considerations" (see People v Seaberg, 74 NY2d 1, 7 [1989]). Thus, we have held that a defendant may only waive a guaranteed right "when there is no constitutional or statutory mandate and no public policy prohibiting [waiver]" (id.).

"Conditions imposed as part of a plea arrangement are valid if the parties agree to them and they do not violate any statute or contravene public policy" (People v Avery, 85 NY2d 503, 507 [1995], citing Seaberg, 74 NY2d at 7; see People v Hansen, 95 NY2d 227, 230 [2000]; People v Allen, 86 NY2d 599, 602 [1995]). The class of rights which may not be waived as part of a plea negotiation is "grounded in the integrity of our criminal justice system and 'the reality of fairness in the process,' " and such rights "implicate either an infirmity in the waiver itself or a public policy consideration that transcends the individual concerns of a particular defendant to obtain appellate review" (see People v Muniz, 91 NY2d 570, 574 [1998], quoting Seaberg, 74 NY2d at 9). In other words, for a right to be nonwaivable, "societal interests" must be present that justify application of "the narrow exception[ ] 'to the general rule that an accused may waive any right [they] enjoy[ ] as part of a plea bargain' " (id., quoting Allen, 86 NY2d at 602-603). Those "public policy consideration[s] that transcend[ ] the individual concerns of a particular defendant" may be grounded in the Legislature's purpose in enacting a particular statute (see Muniz, 91 NY2d at 574). As we discuss, such is the case here.

Notably, many of the statutory and constitutional provisions enshrining rights that this Court has deemed too valuable to be sacrificed in plea bargaining are silent on, or do not expressly address, the issue of waivability (see e.g. People v Armlin, 37 NY2d 167, 172 [1975] [no waiver of right to challenge competency to stand trial pursuant to CPL 730]; People v Blakley, 34 NY2d 311, 314-315 [1974] [no waiver of constitutionally protected right to a speedy trial]; People v Francabandera, 33 NY2d 429, 434 n 2 [1974] [no waiver of right to challenge legality of sentence or voluntariness of plea]; cf. Rudolph, 21 NY3d at 499, 501 [holding that a defendant cannot waive a youthful offender determination because CPL 720.20 (1)'s requirement that " '(u)pon conviction of an eligible youth, the court must order a pre-sentence investigation of the defendant' . . . reflect(s) a policy choice that there be a youthful offender determination in every case where the defendant is eligible, even where the defendant fails to request it, or agrees to forgo it as part of a plea bargain" (emphasis added)]).

C.

Penal Law § 60.12 (1) provides that

"the court, upon a determination following a hearing that (a) at the time of the instant offense, the defendant was a victim of domestic violence subjected to substantial physical, sexual or psychological abuse inflicted by a member of the same family or household as the defendant as such term is defined in [CPL 530.11 (1)]; (b) such abuse was a significant contributing factor to the defendant's criminal behavior; (c) having regard for the nature and circumstances of the crime and the history, character and condition of the defendant, that a sentence of imprisonment pursuant to [Penal Law §§ 70.00, 70.02, 70.06, or 70.71 (2) or (3)] would be unduly harsh may instead impose a sentence in accordance with this section."

By its terms, section 60.12 proceeds in three steps. First, it permits a defendant to request an eligibility hearing. Second, following the hearing, section 60.12 requires the court to make findings of fact as to whether the defendant has met their evidentiary burden to establish their eligibility for an alternative sentence. If the defendant meets that burden, at the third step, the court may exercise its discretion to sentence the defendant as provided in section 60.12 (2)-(11). For example, if the court had held a hearing on defendant's application in this case and determined that a DVSJA sentence was appropriate given her circumstances, it could have sentenced her to a vastly reduced sentence compared to what she would otherwise have been subject to under other provisions of the Penal Law. Here, N.H.'s sentencing exposure on the top count in the indictment, attempted murder in the second degree, was a maximum prison sentence of 25 years and a minimum term of five years. By contrast, under the DVSJA, the court could have imposed a [*5]definite sentence of one year or less in prison, or probation, or a determinate sentence of between one and five years in prison (see Penal Law § 60.12 [2]).

The question remains whether a defendant may waive a section 60.12 eligibility hearing as part of a plea agreement. Though section 60.12's language does not expressly point in either direction, the statutory structure and the animating purpose of the DVSJA alternative sentencing framework establish that the Legislature did not intend for waiver of such a hearing to be a permissible condition of a plea. Contrary to the dissent's view (dissenting op at 13-14, 15-16), our conclusion directly rests on our interpretation of the Legislature's intent, gleaned from both the statutory, textual requirements of Penal Law § 60.12 (1) and the DVSJA's legislative history, in accordance with governing principles of statutory construction (see Matter of Peyton, 36 NY3d at 280; Matter of Auerbach, 86 NY2d at 204).

In enacting the DVSJA's alternative, reduced sentencing framework, the Legislature intended to address what it found was a systemic problem with existing sentences as applied to certain domestic violence survivors (see Section I, supra). The legislative history and statutory background reflect the Legislature's "recognition of the 'national epidemic' of domestic violence" and goal of ameliorating "the failure of prior law to 'allow judges discretion to fully consider the impact of domestic violence' in making sentencing determinations" (see Brenda WW., 44 NY3d at 598, quoting Assembly Mem, at 6). The Legislature reimagined the appropriate sentencing ranges, including alternative non-incarceratory sentences in certain cases, for this particular subgroup of defendants who were themselves victims of domestic abuse. The DVSJA is thus corrective action on a large scale, meant not merely to address excessive sentences on an individual level,FN4 but to recalibrate the criminal legal system to account for the trauma experienced by a class of defendants which led to their chargeable actions.FN5 The Legislature balanced the need to hold defendants accountable with the need to recognize and address a pervasive societal problem, and it determined that consideration of defendants' histories of domestic abuse and their potential for rehabilitation must factor into sentencing determinations. Accordingly, the Legislature enacted the DVSJA to achieve that equilibrium by allowing a survivor to present testimony and documentation at an evidentiary hearing in support of an alternative, reduced sentence (see Penal Law § 60.12 [1]). Interpreting the DVSJA to permit waiver of a survivor's opportunity to "make the case" for an alternative sentence upsets this balance and undermines the Legislature's intent to correct a structural flaw in the criminal law as applied to this class of survivor defendants.

Rather than grapple with the DVSJA's statutory framework or its legislative history in any meaningful way, the dissent concludes that "no law or public policy prohibits a defendant from waiving the opportunity to prove their DVSJA eligibility in exchange for what they determine is a more certain and favorable plea bargain" (dissenting op at 5). The dissent fails to recognize that the Legislature made a public policy choice in enacting the DVSJA that survivor defendants have an opportunity through a section 60.12 hearing for sentencing judges, not prosecutors, to fully consider the survivor's history of domestic violence and its [*6]impact on their criminal behavior, and, in turn, whether they are eligible for, and deserving of, an alternative, reduced DVSJA sentence. To allow waiver of section 60.12 hearings as part of the plea bargaining process would flout the Legislature's intent that a particular subgroup of criminal defendants—domestic violence survivors for whom such experiences of abuse were a significant contributing factor in their criminal conduct—be able to have a judge evaluate whether application of the standard sentencing scheme would be unduly harsh in their individual circumstances and exercise their discretion to impose an alternative, reduced sentence (see Penal Law § 60.12 [1]).FN6 This statutory purpose of correcting a systemic defect in the treatment of domestic violence survivors by the criminal legal system is one which "transcends the individual concerns of a particular defendant" (see Muniz, 91 NY2d at 574).FN7

Moreover, because our system is predominantly one of pleas rather than trials, allowing waiver of section 60.12 hearings would eviscerate this alternative sentencing pathway for the vast majority of domestic violence survivor defendants who plead guilty rather than proceeding to a trial (see Lafler v Cooper, 566 US 156, 170 [2012] ["(T)he reality (is) that criminal justice today is for the most part a system of pleas, not a system of trials"]). That would be inconsistent with the legislative history and an incongruous result given that the Legislature intended to expand, not contract or eliminate, remedial sentencing for survivors. As with certain other rights, a survivor's right to a section 60.12 hearing is "too valuable, both to the [survivor defendant] and to the community, to be sacrificed in plea bargaining" (see Rudolph, 21 NY3d at 501).

Contrary to the dissent's view, our decision today does not undermine a survivor defendant's autonomy or agency in the plea process. That argument ignores reality.FN8 First, the dissent can point to no examples of stymied plea negotiations involving a nonwaivable right, and it utterly fails to make any argument as to why prosecutors would treat survivors differently. Second, the dissent's framing of section [*7]60.12 hearings as a bargaining chip that survivor defendants can use to their advantage during plea negotiations (see dissenting op at 2, 14-15, 21) elides the inherent power imbalance between criminal defendants and the prosecution in those negotiations. Many legal commentators have recognized, and indeed taken as a given, the "coercion inherent in the plea system," as "[o]nce the [S]tate arrests a person and charges them with a crime, the [S]tate has power over them" (see e.g. American Bar Association (ABA) Criminal Justice Section, 2023 Plea Bargain Task Force Report at 15-16 [Feb. 22, 2023], available at https://www.americanbar.org/content/dam/aba/administrative/criminal_justice/reports/plea-bargain-tf-report.pdf [last accessed Apr. 8, 2026]). The Legislature understood as much because it described survivor defendants as victims of abuse that were at times revictimized by application of the standard sentencing scheme (Assembly Mem, at 7). Indeed, nothing in the text or history of the DVSJA suggests that the Legislature envisioned prosecutors would make a plea offer conditioned on the defendant waiving a hearing that might establish their eligibility for a judicially-imposed alternative, reduced sentence. This makes plain that precluding waiver of section 60.12 hearings will not disadvantage survivor defendants in plea negotiations; either a prosecutor is persuaded by the survivor's history and circumstances that they should be sentenced under the DVSJA framework, or not.FN9 If it is the former, then the prosecutor may craft a plea offer that takes their history of domestic violence into consideration, or choose not to oppose the defendant's request for a DVSJA sentence.

We note that in line with the Legislature's carefully crafted framework and its recognition of the trauma of domestic violence, it remains a defendant's choice whether to request a section 60.12 hearing.FN10 As explained by counsel and amici Survivors Justice Project and Sanctuary for Families, domestic violence survivors struggle with the effects of abusive relationships. A survivor may not be ready or willing to discuss their experiences in court. Therapy, family support, and counsel's legal assistance may all be part of the healing process, which takes time.

We further note that while a defendant may request a DVSJA hearing, alternative sentencing is left to the discretion of the trial judge under Penal Law § 60.12 (1) and the Appellate Division in the exercise of its interest of justice power (see Brenda WW., 44 NY3d at 600-601). In sum, in enacting the DVSJA, the Legislature determined that survivors are best positioned to know whether to seek relief and judges are best suited, upon full consideration of a survivor's history, to determine the appropriate sentence that balances accountability and compassion.

The Appellate Division order should be reversed and the case remitted to Supreme Court for further proceedings in accordance with this opinion.

HALLIGAN, J. (Concurring):

I agree that a defendant's right to a hearing under the DVSJA cannot be waived as part of a plea bargain but write separately because in my view there is no need to invoke the public policy consideration referenced in People v Seaberg (74 NY2d 1 [1989]) and

People v Muniz (91 NY2d 570 [1998]). Seaberg holds that "an accused may waive any right which he or she enjoys" through the plea bargaining process, provided "there is no constitutional or statutory mandate and no public policy prohibiting it" (74 NY2d at 7). We have not explored in any detail what might give rise to a public policy consideration sufficiently weighty to preclude waiver or how it is distinct from a constitutional or statutory mandate, other than to note that an appellate claim which "transcends the individual concerns of a particular defendant to obtain appellate review" may be nonwaivable (Muniz, 91 NY2d at 574; see also id. [describing this "narrow" class of claims as those "grounded in the integrity of our criminal justice system and 'the reality of fairness in the process' " (quoting Seaberg, 74 NY2d at 9)]).

I understand the plurality to rest its conclusion on a public policy consideration (see plurality op at 16-17, citing Muniz, 91 NY2d at 574), but I believe that a statutory mandate answers the question. We need not look beyond that, and in my view doing so could intrude on the Legislature's prerogative to set the parameters for sentencing. Other rights we have deemed nonwaivable on policy grounds have a constitutional dimension (see People v Blakely, 34 NY2d 311, 314 [1974] [speedy trial]; People v Francabandera, 33 NY2d 429, 434 n 2 [1974] [illegal sentence]; People v Armlin, 37 NY2d 167, 172 [1975] [competency]; People v Johnson, — NY3d —, —, 2025 NY Slip Op 06528, *1 [2025] [facial constitutional challenge]). Here, the policy at play—though surely important—is grounded instead in the Legislature's determination that the criminal justice system has not adequately accounted for offenders who are themselves survivors of domestic violence. I am uncertain what follows from according this legislative choice the same weight we have given considerations with constitutional magnitude; for example, would we permit the Legislature to reverse course if it someday chose to do so? I think the safer route is to stick to "ascertain[ing] and giv[ing] effect to the intention of the Legislature" (People v Galindo, 38 NY3d 199, 203 [2022] [internal quotation marks omitted]).

For the reasons recounted by the plurality (see plurality op at 2-5), I think the Legislature's intent here is plain. The People's position threatens to essentially eviscerate the statute by excluding the overwhelming majority of defendants who have suffered domestic violence—that is, those who plead guilty, rather than proceeding to trial—from the DVSJA's benefits FN*. Reading the statute to allow all of those individuals to be held to a waiver would significantly undermine a scheme that, as the plurality explains, was intended to [*8]reach broadly (see Calabrese v City of Albany, 43 NY3d 167, 174 [2024] [declining "to read (a) statute in a manner that would produce ( ) an objectionable, unreasonable or absurd consequence"]; McKinney's Cons Laws of NY, Book 1, Statutes § 145). Moreover, the plain language of the DVSJA states that it applies "where a court is imposing sentence upon a person" (Penal Law § 60.12 [1]). While admittedly not cast in the same mandatory language of the youthful offender statute (see CPL 720.20 [1]), I have no trouble reading this phrase to support the notion that the Legislature intended DVSJA relief to be available in every appropriate case. That the relief should be available, however, does not require the sentencing court to consider DVSJA relief without the defendant requesting it or limit the court's discretion in making the final determination. This interpretation is consistent with the legislative goal and the problem that the legislators sought to address.

CANNATARO, J. (Dissenting):

In the Domestic Violence Survivors Justice Act (DVSJA or the Act), the legislature created an opportunity for people convicted of certain crimes to seek reduced sentences by proving that their criminal acts were influenced by a history of exposure to domestic

violence. The question on this appeal is whether a defendant who agrees as part of a plea bargain not to pursue DVSJA relief is bound by that agreement, or possesses an unwaivable right under the Act to seek a reduced sentence while retaining the benefit of the plea deal.

Like both courts below, I would hold defendant to her bargain. Nothing in the language or structure of the DVSJA evinces a legislative intent that a DVSJA hearing and determination occur in every case. The statute does not, for example, purport to compel a potentially eligible defendant to engage in the DVSJA process, prevent them from withdrawing a request for DVSJA relief when they determine that it is in their best interests to do so, or prohibit them from using the prospect of DVSJA relief to their advantage in plea negotiations. Consequently, nothing in the DVSJA indicates that the legislature intended to prohibit a defendant from waiving the opportunity to prove their DVSJA eligibility where they, in their informed judgment, conclude that a negotiated plea is more advantageous. My colleagues' contrary conclusion ignores our precedent and misapplies ordinary canons of statutory construction, continuing an unfortunate trend under which this Court's waiver jurisprudence has become increasingly arbitrary (see e.g., People v Johnson, — NY3d —, —, 2025 NY Slip Op 06528, *6 [2025] [Cannataro, J., concurring]). I dissent.

I.

Defendant was arrested and charged with numerous offenses, including attempted murder in the second degree (Penal Law §§ 110.00, 125.25 [1]), after she ran over her sister's girlfriend with her vehicle during a block party, "reversed the vehicle back over the victim's body, and then drove the vehicle forward again over the victim, in essence striking the victim three times with her vehicle before eventually dragging the victim down the street under the vehicle and fleeing the area" (232 AD3d 200, 201-202 [2d Dept 2024]). During the pendency of this criminal action, defendant requested a hearing to determine her eligibility for a reduced sentence under the DVSJA (see Penal Law § 60.12). The request was supported by a psychologist's evaluation that detailed defendant's self-described history of exposure to domestic violence, as well as her claim that she was attempting to evade an attack by her abusive ex-paramour after a fight broke out at the block party and did not realize that she had run over the victim three times. To date, defendant's claims have never been tested before a fact finder.

Before a DVSJA hearing could be held in this case,FN1 defendant agreed to plead guilty to assault in the first degree (Penal Law § 120.10 [3]) in full satisfaction of the 16-count indictment. The agreed-upon sentence was five years in prison, followed by five years of post-release supervision, a significant reduction from the 25-year sentence she faced on the attempted murder charge (see id. §§ 70.02 [3] [a], 110.05 [3], 125.25). In detailing the parties' agreement before the court, the People noted that the agreement was contingent on defendant withdrawing her request for DVSJA relief, thereby requiring defendant to waive the opportunity to seek a further reduction of her sentence. Defense counsel responded that, although "the lawyers" felt that condition went against the "spirit" of the DVSJA, defendant maintained over the course of "multiple conversations" that she was "fully aware of . . . what rights she has given up" and "at no time did [she] . . . waiver from her intent today to take the People's offer."

Supreme Court initially indicated that it was not "100 percent clear" whether DVSJA relief could be waived, observing that this Court had precluded waivers of youthful offender treatment as part of a plea bargain (see People v Rudolph, 21 NY3d 497 [2013]). However, after reviewing the applicable statutes and precedent, the court distinguished the DVSJA from the youthful offender statute, primarily based on the DVSJA's significantly more permissive language. The court then accepted the plea and imposed the bargained-for sentence.

On intermediate appeal, defendant argued that the waiver of a DVSJA request may not be a condition of a negotiated plea agreement, and that Supreme Court therefore erred in failing to hold a DVSJA hearing notwithstanding the negotiated waiver. Defense counsel nonetheless asked the Appellate Division to keep in place all the aspects of the plea deal that benefitted defendant, including the reduced charge. The Appellate Division unanimously affirmed the judgment, agreeing with Supreme Court that DVJSA relief can be voluntarily waived in return for a favorable plea bargain (232 AD3d at 201). In so holding, the Appellate Division "note[d] that the defendant does not dispute that her waiver of a DVSJA hearing was otherwise knowingly, intelligently, and voluntarily made," and characterized the plea offer as "lenient" given defendant's concession that she was "in fact guilty of inflicting grave, serious injuries to the victim" (id. at 208). The Appellate Division also rejected defendant's excessive sentence claim on the merits (id.).

II.

This Court has long recognized that plea bargaining is "a vital part of our criminal justice system," without which "New York's law enforcement system would collapse" (People v Seaberg, 74 NY2d 1, 7 [1989]; accord People v Thomas, 34 NY3d 545, 557 [2019]; see generally People v Selikoff, 35 NY2d 227, 232-235 [1974], cert denied 419 US 1122 [1975]). "Aside from conserving judicial resources and providing finality in criminal proceedings, the plea bargaining process affords the accused the opportunity to obtain a conviction on reduced charges and more lenient punishment in a truncated process that hopefully starts the offender on the road to possible rehabilitation" (Thomas, 34 NY3d at 557 [internal quotation marks, brackets, and citation omitted]; Seaberg, 74 NY2d at 7; Selikoff, 35 NY2d at 232-235; see also Santobello v New York, 404 US 257, 261 [1971]). Although this process "necessarily includes the surrender of many guaranteed rights . . . when there is no constitutional or statutory mandate and no public policy prohibiting it, an accused may waive any right which he or she enjoys" (Seaberg, 74 NY2d at 7 [emphasis added]). In other words, there is a presumption in favor of waivability that is rebutted only by evidence of a contrary constitutional, legislative, or public policy mandate.

As I will explain, no law or public policy prohibits a defendant from waiving the opportunity to prove their DVSJA eligibility in exchange for what they determine is a more certain and favorable plea bargain. The opportunity to seek DVSJA relief, like most rights bargained with during plea negotiations, is waivable.

[*9]A.

As a threshold matter, no one contends that the bargain struck in this case was prohibited by constitutional mandate or by any public policy that exists independently of the DVSJA itself (see plurality op at 12, 14; concurring op at 2). The legislature's decision to offer people who claim to be domestic violence survivors the opportunity to seek reduced sentences at a judge's discretion is not constitutionally mandated. It is "a legislative policy choice" (see People v Ramirez, 89 NY2d 444, 449-450 [1996]), and a recent one at that—the Act only became effective in May 2019, barely two months before defendant's offense (L 2019, ch 31, § 6).

With respect to public policy, it warrants emphasis that " '[t]he constitutional principle of separation of powers . . . requires that the Legislature make the critical policy decisions' " (People v Francis, 30 NY3d 737, 751 [2018], quoting Bourquin v Cuomo, 85 NY2d 781, 784 [1995]; see also id. [explaining that "(f)undamental policy choices epitomize legislative power, as balancing of differing interests is a task the multimember, representative Legislature is entrusted to perform under our constitutional structure" (internal quotation marks, ellipsis, and brackets omitted)]). "The public policy of the State of New York as determined and recorded by the Legislature may not be changed and rewritten by a court to satisfy its own private notion of what the public policy of the State ought to be" (Waddey v Waddey, 290 NY 251, 256 [1943]). Consequently, the only instances in which this Court historically has ruled that public policy prohibits defendants from waiving a right in plea negotiations are those "narrow" scenarios in which enforcement of the waivers threatened "the integrity of our criminal justice system and 'the reality of fairness in the process' "FN2 (see People v Muniz, 91 NY2d 570, 574 [1998], quoting Seaberg, 74 NY2d at 9). No such threat is present here.

B.

Because no constitutional mandate or freestanding public policy is implicated in this case, the issue comes down to whether defendant's waiver was prohibited by the DVSJA itself (see Seaberg, 74 NY2d at 7). It is, of course, within the legislature's power when creating a statutory right to prohibit the intended beneficiaries of that right from waiving its protections. As the plurality observes, there have even been rare instances when this Court has concluded that the legislature intended to prohibit the waiver of a statutory benefit notwithstanding the fact that the statute in question was "silent on, or d[id] not expressly address, the issue of waivability" (plurality op at 12). We have cautioned, however, that we "do not make this decision lightly" (see Rudolph, 21 NY3d at 501). As in any statutory interpretation case, the search for legislative intent must be grounded, in the first instance, upon the language of the statute itself. " '[W]e are not at liberty to second-guess the legislature's determination, or to disregard—or rewrite—its statutory text' " (Xiang Fu He v Troon Mgt., Inc., 34 NY3d 167, 172 [2019], quoting Matter of New York Civ. Liberties Union v New York City Police Dept., 32 NY3d 556, 567 [2018]), "even if we would have struck a slightly different balance on our own" (Matter of Wolpoff v Cuomo, 80 NY2d 70, 79 [1992]; see also Matter of Metropolitan Life Ins. Co. v Boland, 281 NY 357, 361 [1939] ["We are not privileged, by judicial construction, to legislate"]; McKinney's Cons Laws of NY, Book 1, Statutes, § 363 ["(A) court cannot amend a statute by inserting words that are not there, nor will a court read into a statute a provision which the Legislature did not see fit to enact. More particularly, a court cannot, by implication, read or supply in a statute a provision which it is reasonable to suppose the Legislature intentionally omitted"]).

As the parties and all the judges below recognized, People v Rudolph (21 NY3d 497 [2013]) exemplifies how this search for legislative intent is properly conducted. In Rudolph, we held that a defendant [*10]may not waive the right to youthful offender treatment as part of a plea agreement. We based that conclusion on the statutory text itself, which provided that "[u]pon conviction of an eligible youth, the court must order a pre-sentence investigation of the defendant" and ultimately "must determine whether or not the eligible youth is a youthful offender" (CPL 720.20 [1]). We reasoned that the legislature's repeated use of the word "must" reflected an explicit "policy choice that there be a youthful offender determination in every case where the defendant is eligible, even where the defendant fails to request it, or agrees to forgo it as part of a plea bargain" (21 NY3d at 501).

Unlike the youthful offender scheme, the DVSJA contains no language compelling that there be a hearing and determination in every case. There is no language in the statute requiring a sentencing court to order a report or examine the record for signs that a DVSJA hearing might be warranted. Nor is there any language requiring defense counsel or the People to alert the court if they are aware of facts which might suggest the applicability of the DVSJA. The DVSJA process is triggered by a defendant's request for relief, and there is no language in the statute requiring a potentially eligible defendant to make such a request or prohibiting them from withdrawing their request before relief is ordered. Further, even when relief is requested and the three factual prerequisites to relief are established, the statute still does not compel a court to grant such relief; it conspicuously uses the permissive word "may" rather than the mandatory word "must" (Penal Law § 60.12 [1]; see also plurality op at 3, 13). Put simply, the DVSJA process is framed as an opportunity that may be pursued at a defendant's sole election, and that is never guaranteed, not a procedure that must be followed irrespective of whether the defendant even desires the relief.

That conclusion does not change if one looks beyond Penal Law § 60.12 to the other provisions of the DVSJA. Since defendant's offense was committed after the effective date of the Act, her request was governed by section 60.12. In CPL 440.47, the DVSJA also affords defendants sentenced "prior to the effective date of [the Act]" an opportunity to be resentenced after its passage (CPL 440.47 [1] [a]). In that context, too, the opportunity is left to the discretion of the defendant, and the determination to award relief is left to the discretion of the court. Indeed, CPL 440.47 expressly contemplates that resentencing applications may be "withdraw[n]" at the election of defendants, even after a hearing (see CPL 440.47 [2] [g], [3]). And while the legislature ensured that defendants sentenced prior to the effective date of the Act were afforded this opportunity, the Act notably provides no similar opportunity for defendants sentenced after the effective date of the Act who failed to alert the sentencing court to their potential DVSJA eligibility. Thus, under the Act, defendants are afforded only one opportunity to establish their eligibility for relief, which in the pre-sentencing context can be forfeited through inaction (see People v Smalls, 128 AD3d 1229, 1230 [3d Dept 2015], lv denied 27 NY3d 1006 [2016], reconsideration denied 27 NY3d 1155 [2016], cert denied 580 US 1002 [2016], habeas denied 2017 US Dist LEXIS 238417 [ND NY 2017]). Had the legislature viewed such rights as being "too valuable . . . to be sacrificed" (see Rudolph, 21 NY3d at 501), it would not have limited relief in this manner.

Rudolph was decided six years before the legislature enacted the DVSJA. It should therefore be assumed that the legislature was aware of our decision in that case and the type of language we consider indicative of legislative intent to prohibit waiver when such a prohibition is not explicitly stated (see e.g., People v Galindo, 38 NY3d 199, 205 [2022]; Arbegast v Board of Educ. of S. New Berlin Cent. School, 65 NY2d 161, 169 [1985]). That the legislature chose not to employ the necessary mandatory phrasing when it enacted the DVSJA—and instead used language affirmatively indicating that the DVSJA opportunity is discretionary and permissive—strongly indicates that it was comfortable with the idea of defendants electing to forgo the DVSJA process in the pursuit of some other advantage, such as a favorable plea bargain.FN3

Indeed, since Rudolph, the legislature appears to have been explicit when it intends to make a statutory right unwaivable in the context of plea bargains. CPL 245.25 (2), for example, expressly prohibits a defendant from waiving their statutory right to automatic discovery as a condition of a plea bargain. The statute provides, in relevant part, that where a prosecutor offers a defendant a guilty plea on an indictment, the defendant "may waive his or her rights" to automatic discovery, "but a guilty plea offer may not be conditioned on such waiver" (CPL 245.25 [2]).

Just as the legislature explicitly provided in CPL 245.25 (2) that "a guilty plea offer may not be conditioned on" the waiver of the right to discovery, the legislature could easily have provided that a guilty plea offer may not be conditioned on the waiver of DVSJA rights. Although Rudolph contemplates that the legislature need not always be so explicit, the legislature's omission of a similar provision in the DVSJA is an especially powerful signal of legislative intent given that the automatic discovery statute and the DVSJA were approved by the same legislature at virtually the same time FN4. In these circumstances, it is appropriate to conclude that while the legislature was concerned about defendants waiving their right to automatic discovery as a condition of their pleas, it was not similarly troubled by the possibility of defendants waiving the right to seek discretionary sentencing relief under the DVSJA.

C.

The plurality provides a generalized summary of the statutory text (see plurality op at 3, 13), and purports to ground its conclusions, at least in part, in the "statutory structure" (see id. at 4, 14). Yet only the concurrence offers anything that could remotely be characterized as supportive textual analysis. The concurrence opines "that the Legislature intended DVSJA relief to be available in every appropriate case" because "the plain language of the DVSJA states that it applies 'where a court is imposing sentence upon a person' " (concurring op at 3, quoting Penal Law § 60.12 [1]). Had the legislature provided that a DVSJA hearing and determination must occur at the time a court is imposing a sentence upon a person, that would indeed be a legislative signal along the lines of Randolph. What the statute actually says, however, is that "where a court is imposing sentence upon a person . . . the court, upon a determination following a hearing [that the three prerequisite factual requirements are met] . . . may . . . impose a sentence in accordance with this section" (Penal Law § 60.12 [1] [emphasis added]). The quoted language authorizes a court to consider DVSJA relief at the time of sentencing, but it does not require that a hearing occur against the defendant's wishes or agreement. This language also serves to distinguish Penal Law § 60.12, which deals with DVSJA requests at the time of sentencing, from CPL 440.47, dealing with resentencing applications.

In contrast, the plurality never points to any specific structural element, provision, sentence, or even a single word of the DVSJA that supports its conclusions FN5. To the extent the plurality engages in textual analysis at all, its conclusions are consistent with mine that the statute does not reflect a legislative "policy choice that there be a [DVSJA hearing and] determination in every case where the defendant is eligible, even where the defendant fails to request it" (Rudolph, 21 NY3d at 501). The plurality in fact takes pains to stress that under the DVSJA, it is "a defendant's choice whether to request a section 60.12 hearing"FN6 (see plurality op at 19). That concession should be dispositive, because it admits that the legislature contemplated and accepted that, in certain situations, a defendant might voluntarily choose not to pursue the opportunities afforded by the DVSJA. There is no reason to think the legislature considered a right "too valuable . . . to be sacrificed in plea bargaining" if it can be forfeited by mere failure to request it, and if a request can be withdrawn in the defendant's sole discretion (see Rudolph, NY3d at 501).

Despite failing to identify anything in the statutory text that renders it reasonably susceptible to an interpretation that defendants are precluded from waiving the opportunity to seek DVSJA relief, the plurality turns to—and ultimately grounds its holding entirely in—the "animating purpose" behind the DVSJA (see plurality op at 14-15). That approach is both improper and ultimately unavailing.

As the plurality correctly observes, the legislature enacted the DVSJA in recognition of "the failure of prior law to 'allow judges discretion to fully consider the impact of domestic violence' in making sentencing determinations" (People v Brenda WW., — NY3d —, —, 2025 NY Slip Op 03643, *1 [June 17, 2025], quoting Assembly Mem in Supp, Bill Jacket, L 2019, ch 31, at 6). The DVSJA, however, accomplishes that objective by affording judges the discretion to impose a sentence within an alternative, reduced range when a defendant pursues that relief and proves their eligibility. Defendant here had the "opportunity through a section 60.12 hearing for sentencing judges, not prosecutors, to fully consider [her alleged] history of domestic violence and its impact on [her] criminal behavior, and, in turn, whether [she was] eligible for, and deserving of, an alternative, reduced DVSJA sentence" (plurality op at 16). She was "able to have a judge evaluate whether application of the standard sentencing scheme would be unduly harsh in [her] individual circumstances and exercise their discretion to impose an alternative, reduced sentence" (id. [emphasis added]). But defendant—who was in the best position to gauge her tolerance for the risk of being unsuccessful, both at trial and any DVSJA hearing—instead made the informed choice to waive the uncertain prospect of DVSJA relief in favor of a negotiated plea and sentence. Specifically, she was permitted to plead guilty to mere assault rather than attempted murder, and was offered a sentence of five years rather than the potential maximum of 25 years. In her counsel's words, defendant did so "fully aware of . . . what rights she [w]as giv[ing] up."

The plurality's perception of a generalized purpose on the part of the legislature to create a "fairer system of justice in which judges respond to qualifying survivors with 'compassion and assistance' " (plurality op at 5) does not give this Court free rein to rewrite the statute in any way we please to make our criminal justice system subjectively "better" (see Waddey, 290 NY at 256). Although the legislature could certainly have decided that its policy objectives would be frustrated by allowing potentially eligible [*11]defendants to waive a request for DVSJA relief in favor of a negotiated plea bargain, it could have just as logically determined that fairness and compassion are achieved as long as all defendants are afforded a full and fair opportunity to seek a reduced sentence—which defendant undisputedly had here. Because "it is reasonable to suppose the Legislature intentionally omitted" a prohibition on DVSJA waivers, we cannot read or supply into the statute that prohibition by implication (see McKinney's Cons Laws of NY, Book 1, Statutes, § 363)

The plurality's misapplication of statutory construction principles is further apparent in its statement that "nothing in the text or history of the DVSJA suggests that the Legislature envisioned prosecutors would make a plea offer conditioned on the defendant waiving a hearing that might establish their eligibility for a judicially-imposed alternative, reduced sentence" (see plurality op at 18-19). If the legislature did not even contemplate DVSJA waivers, the legislative history cannot plausibly be said to reveal legislative intent to prohibit defendants from waiving possible DVSJA relief through plea negotiations, which is the showing required here (see Rudolph, 21 NY3d at 501 ["Ordinarily, of course, defendants may choose to give up their rights, even very important ones"]).

Ultimately, the plurality fails to cite so much as a single legislator's comment articulating an intent to prohibit waiver FN7. My colleagues rely instead on a bar association publication questioning the fairness of the plea-bargaining process more generally (see plurality op at 18). That authority may accord with the plurality's personal policy views, but it is not properly consulted in the search for legislative intent, nor does it align with this Court own's precedent on plea bargaining (see Seaberg, 74 NY2d at 7; Selikoff, 35 NY2d at 232-235; Santobello, 404 US at 261). A right is not unwaivable simply because some members of this Court subjectively think the "purpose" behind it is more important than the value they personally assign to plea bargaining.

The plurality also attempts to meld the statutory interpretation question with our public policy waiver jurisprudence, asserting that the DVSJA was "meant not merely to address excessive sentences on an individual level" (plurality op at 15). It is true that this Court has in very limited contexts held that a waiver of rights was prohibited due to "a public policy consideration that transcends the individual concerns of a particular defendant to obtain appellate review" (see Muniz, 91 NY2d at 574). But DVSJA rights are a particularly poor fit for that exception. The way in which the legislature "recalibrate[d] the criminal legal system" to account for the influence of domestic violence was by addressing sentences on an individual level. Under the Act, the availability of relief in a particular case turns on highly individualized factual considerations, which exist only in a fairly small proportion of criminal cases (see Penal Law § 60.12 [1]). Each DVSJA determination therefore has little precedential value for future cases (compare Johnson, — NY3d at —, 2025 NY Slip Op 06528, at *2 [the right to argue a facial constitutional challenge on appeal cannot be waived because of the potentially broad preclusive effect of such claims]). To the extent the plurality suggests that a statutory opportunity is unwaivable simply because it is made available to a "particular subgroup of criminal defendants" (see plurality op at 16), that would be a dramatic extension of our waiver jurisprudence with no basis in law.

III.

My colleagues assert that, because most criminal proceedings end in pleas rather than trials, permitting defendants to waive DVSJA relief in plea negotiations would "eviscerate this alternative sentencing pathway for the vast majority of domestic violence survivor defendants" (plurality op at 17; concurring op at 3). I struggle to see how that is the case. A defendant who thinks they would be better off [*12]seeking relief under the DVSJA rather than accepting a plea offer remains free to reject the offer and pursue their rights under the Act. Moreover, a sentencing court has the discretion to impose a sentence different than that negotiated by the parties, or to reject a plea entirely if it concludes that it is not in the defendant's best interests (see generally People v Farrar, 52 NY2d 302 [1981]). Therefore, even if waivers are enforced, the only scenario in which the DVSJA will go unused is if defendants in the majority of cases are offered sentences they, and sentencing judges, believe are fair. This hardly seems like a scenario the legislature would consider "absurd" or "incongruous" with their objectives (see plurality op at 11, 17; concurring op at 3).

Another flaw in my colleagues' logic is that it extends to plea bargaining more broadly. The right to a jury trial is expressly constitutionally mandated (US Const, art III § 2 and sixth amend). Yet, as the concurrence notes, in 2019 "96 percent of felony convictions and 99 percent of misdemeanor convictions in New York were the result of guilty pleas" (concurring op at 3 n *). DVSJA waivers do not "eviscerate" the DVSJA any more than plea bargaining "eviscerates" the right to a jury trial, and waiver of the right to a jury trial has long been viewed as "not only an essential part . . . but a highly desirable part" of the plea-bargaining process (see Santobello, 404 US at 261; accord Bordenkircher v Hayes, 434 US 357, 361-362 [1978]; Thomas, 34 NY3d at 557).

If DVSJA procedures can be waived, then the People will necessarily have to consider the statutory criteria and account for the possibility of DVSJA relief when making plea offers if they hope to encourage defendants to waive the procedures. Absent an enforceable waiver, the People have no incentive to do so. In this way, waivers align the plea-bargaining process with the legislature's objectives in enacting the DVSJA. The facts of this case provide a good example: the People's offer of five years' incarceration was within the DVSJA range and at the very lowest end of the ordinary sentencing range, despite the serious and life-long injuries that defendant inflicted. This case if anything evidences that the DVSJA has been operating exactly as the legislature intended.

At oral argument, defense counsel gave an enlightening response when asked why, if DVSJA waivers truly threaten to eviscerate the Act, that wouldn't "suggest that the legislature would automatically step in" (oral argument transcript at 22). Defense counsel explained that advocates have identified several "foundational errors in how [the DVSJA] was drafted, but the wheels of the legislature move very slowly" (id. at 23). The clear implication of that response is that advocates have already attempted to obtain from the legislature the relief they now seek from this Court but have been unsuccessful in doing so, despite their claims of impending disaster.

That this appeal is operating as a judicial end-run is further evident from the amici brief submitted by a group of legislators in support of defendant's position. Of these amici legislators, only 14 held office when the DVSJA was enacted in 2019, meaning that they comprise less than 7% of the legislative branch's membership at the time. Their brief therefore provides no reliable evidence of the full legislature's intent (see Ezrasons, Inc. v Rudd, 44 NY3d 532, 551 [2025] ["isolated statements of . . . individual legislators . . . cannot establish legislative intent" (internal quotation marks omitted)]). It is notable, however, that this group has elected to ask this Court to fix a purported drafting error in the DVSJA rather than gather the necessary legislative quorum to fix it themselves. Perhaps the explanation for that is the same reason why 93% of the 2019 legislature did not sign onto their brief: what defense counsel is now characterizing as a drafting error was in fact a deliberate policy choice at the time.

I am not oblivious to the fact that many people in this State believe that criminal sentencing reform is desperately needed. It has nonetheless proved a politically contentious issue in recent years. This Court must remain neutral and above that fray; we are adjudicators, not activists. The constitution prevents us from rewriting a statute to achieve what we or advocates perceive as a better way of effectuating its animating purpose (People v Anonymous, 34 NY3d 631, 643 [2020]). That duty belongs to the People's elected representatives in the legislature, through a democratic process that inevitably involves compromise (see Xiang Fu He, 34 NY3d at 175 ["As we have repeatedly made clear, the courts do not sit in review of the [*13]discretion of the Legislature or determine the expediency, wisdom, or propriety of its actions on matters within its powers" (internal quotation marks omitted)]). Although convincing a majority of the legislature to act can take time, it is the process our separation of powers demands on policy questions; it cannot constitutionally be circumvented by this Court.

IV.

The sad irony of this appeal is that, while my colleagues' intent is doubtless to protect defendant's interests, their decision may have precisely the opposite effect. That is because, as a result of today's decision, the People are entitled to withdraw their plea offer on remand, exposing defendant once again to trial on 16 serious offenses, after which she only "may" be entitled to a reduced sentence under the DVSJA (see Penal Law § 60.12 [1]; Farrar, 52 NY2d at 307-308)FN8. It is not hyperbolic to predict that, after all is said and done in this case, defendant may find herself subject to a far longer sentence than she agreed to below.

If a defendant sees a concrete plea offer as more beneficial than the remote and uncertain possibility of DVSJA relief, this Court should not paternalistically deprive them of the agency to take that deal. Defendants—not this Court—are in the best position to know whether the DVSJA process is a viable and beneficial option in a particular case. The legislature—not this Court—is in the best position to answer the policy question of whether the relief they created in the DVSJA outweighs society's interest in plea bargaining. In this case, defendant made her choice clear when she accepted the plea notwithstanding the waiver condition. By using purely permissive language even in the face of our decision in Rudolph, the legislature signaled that DVSJA relief is waivable. We should respect both defendant's and the legislature's choices and hold that DVSJA procedures are waivable as part of a knowing, voluntary, and intelligent plea bargain.

Order reversed and case remitted to Supreme Court, Kings County, for further proceedings in accordance with the opinion herein. Opinion by Judge Rivera. Chief Judge Wilson and Judge Troutman concur. Judge Halligan concurs in result in an opinion. Judge Cannataro dissents and votes to affirm in an opinion, in which Judges Garcia and Singas concur.

Decided April 23, 2026

Footnotes

Footnote 1

In enacting the DVSJA, the Legislature expanded upon Jenna's Law to broaden the category of survivor defendants eligible for alternative sentences and dramatically reduce their sentencing exposure. For example, Jenna's Law applied only to survivor defendants convicted of offenses against their abuser, whereas DVSJA relief is available even where the crime was committed against a third party (compare Penal Law § 60.12 [1], with former Penal Law § 60.12 [1] [2014]). Jenna's Law also excluded murder convictions, while the DVSJA does not (compare Penal Law § 60.12 [3], [4], with former Penal Law § 60.12 [2014]; see New York State Division of Criminal Justice Services, Overview of Key Provisions of Chapter 1 of the Laws of 1998 - Jenna's Law, available at https://www.criminaljustice.ny.gov/pio/jenna.htm [last accessed Apr. 8, 2026]). Additionally, the DVSJA, unlike Jenna's Law, allows judges to impose non-incarceratory sentences (compare Penal Law § 60.12 [2], [9], [10], with former Penal Law § 60.12 [2], [3] [2014]).

Footnote 2

To the extent the dissent suggests N.H. took this plea in bad faith, only to now appeal (see dissenting op at 3-4, 14-15), we note that defendants commonly challenge conditions of pleas on appeal as part of the appellate review process. Moreover, the trial court itself expressed uncertainty about whether N.H. could waive her right to request a section 60.12 hearing, alerting the prosecution to the possibility that this open question of law would be litigated on appeal. Additionally, the record on this appeal suggests a motive other than gamesmanship. N.H.'s acceptance of the plea offer of five years' incarceration likely hastened her reunion with her young child, T., for whom she was the primary caregiver prior to the instant offense. Moreover, during N.H.'s pre-trial incarceration, T. was placed in the custody of R.L., N.H.'s abusive ex-boyfriend. After N.H. was released on bail, the caseworker who supervised her first court-ordered visit with T. reported that it went "extremely well . . . it was like a reunion . . . they were so happy to see each other." However, R.L. refused to bring T. to many subsequent scheduled court-ordered visits, which, as N.H. described to the psychologist, "ha[d] been very difficult for her emotionally but . . . her primary concern [wa]s how this must be impacting [T.], and that she [wa]s not able to help [T.] to process or understand this situation."

Footnote 3

According to the prosecution, during the pendency of the appellate proceedings, N.H. was conditionally released and placed on PRS.

Footnote 4

Indeed, a procedure for reducing excessive or unduly harsh individual sentences in the interest of justice already exists under the CPL (see CPL 470.15).

Footnote 5

The legislative history indicates that the Legislature recognized the benefits both to the survivor and the broader community. For example, the Sponsor's Memorandum notes that "[c]ommunity-based alternative programs are more effective than prison in allowing survivors to rebuild relationships with their families, recover from abuse, and take responsibility while positively participating in their communities" (Assembly Mem, at 7). The memorandum further states that "[a]llowing mothers to live in the community while serving sentences also permits them to maintain ties to children and lessen the trauma of separation - thereby increasing the likelihood that children will receive the support they need to become healthy, productive adults" (id.).

Footnote 6

The dissent notes that CPL 245.25 (2)—which provides that " 'a guilty plea offer may not be conditioned on [the defendant's] waiver' " of their rights to automatic discovery—was approved in the same legislative term as the DVSJA (see dissenting op at 11, quoting CPL 245.25 [2]; see id. at 11 n 4). The dissent ignores that these two statutes involve different subject matter. In addition, the votes on the DVSJA were several weeks before the votes on CPL 245.25 (2), and nothing in the legislative history hints that the Legislature considered waiver when passing the DVSJA.

Footnote 7

The dissent erroneously argues that "the availability of [DVSJA] relief in a particular case turns on highly individualized factual considerations," and therefore "DVSJA rights are a particularly poor fit" under the waiver exception for " 'public policy consideration[s] that transcend[ ] the individual concerns of a particular defendant' " (see dissenting op at 17, quoting Muniz, 91 NY2d at 574). However, the dissent fails to understand that the Legislature has chosen to mandate a particular framework applicable to all survivor defendants, one that governs section 60.12 hearings and a judge's determination to grant an alternative, reduced DVSJA sentence. This amounts to a system-wide remedial action intended to address a defect affecting a particular subgroup of defendants. That legislative choice is grounded in public policy considerations that transcend any individual defendant and thus supports our conclusion that waiver of a section 60.12 hearing is not a permissible condition of a plea (see Muniz, 91 NY2d at 574).

Footnote 8

In fact, amici Survivors Justice Project and Sanctuary for Families, organizations that work directly with and are comprised of domestic violence survivors, urge the opposite: that allowing prosecutors to require survivor defendants to waive section 60.12 hearings as a plea condition has harmful consequences for survivors. The dissent's assumptions about a survivor defendant's autonomy in plea bargaining are unsupported by the amici or any other groups representing the interests of domestic violence survivors.

Footnote 9

We have no occasion to speculate, as does the dissent (see dissenting op at 20-21, 21 n 8), on a hypothetical prosecution motion to withdraw their consent to the plea offer.

Footnote 10

The dissent relies on People v Rudolph (21 NY3d 497) to conclude that section 60.12 hearings may be waived as a plea condition because "[u]nlike the youthful offender scheme [at issue in that case], the DVSJA contains no language compelling that there be a hearing and determination in every case" (see dissenting op at 8-9). However, it is because domestic violence survivors are a unique class of defendants that it is their choice whether to request a section 60.12 hearing in the first instance. In enacting the DVSJA, the Legislature assumed survivors have the agency to make a choice to avail themselves of the section 60.12 hearing procedure to seek alternative, reduced sentences. Therefore, contrary to the dissent's view, the absence of mandatory language such as "must" in section 60.12, as contrasted with the youthful offender statute, is not a compelling basis upon which to conclude that section 60.12 hearings may be waived as a condition of a plea (see id.).

Furthermore, although the dissent argues that "Rudolph was decided six years before the [L]egislature enacted the DVSJA" and "[i]t should therefore be assumed that the [L]egislature was aware of our decision in that case and the type of language we consider indicative of legislative intent to prohibit waiver when such a prohibition is not explicitly stated" (dissenting op at 10), it was equally the state of the law at the time of the DVSJA's enactment that silent legislation could be interpreted by this Court as prohibiting waiver in the plea bargaining context—indeed, that is exactly the conclusion reached by this Court in Rudolph, although the youthful offender statute did not expressly address waiver (see 21 NY3d at 499, 501-502). Finally, to the extent that Rudolph is relevant here, we note that both the DVSJA and the youthful offender statute contemplate judicial action to determine whether a defendant is eligible for relief (see id. at 501).

Footnote *

As of 2019, 96 percent of felony convictions and 99 precent of misdemeanor convictions in New York were the result of guilty pleas (New York State Association of Criminal Defense Lawyers, The New York State Trial Penalty: The Constitutional Right to Trial Under Attack at 15-16 [2021], available at new_york_state_trial_penalty_report_ final_03262021.pdf).

Footnote 1

DVSJA relief is only authorized under Penal Law § 60.12 (1) "where a court is imposing sentence upon a person," which necessarily can only occur following a conviction.

Footnote 2

For instance, waivers will not be enforced if they prevent a defendant from establishing that the plea bargain was not in fact agreed to, implicate our jurisdiction to enforce the plea deal, or would create a situation in which innocent persons would be compelled to plead guilty (see Muniz, 91 NY2d at 574; Johnson, — NY3d at —, 2025 NY Slip Op 06528, at *5 [Cannataro, J., concurring] [collecting authorities]).

Footnote 3

That conclusion is only strengthened when one appreciates that the language we relied on in Rudolph is not especially unique. The legislature has used similar language when it intends to make sentencing-related procedures mandatory in criminal cases. For instance, CPL 400.21 provides that "[w]hen information available to the court or to the people prior to sentencing for a felony indicates that the defendant may have previously been subjected to a predicate felony conviction, a statement must be filed by the prosecutor before sentence is imposed setting forth" relevant information (CPL 400.21 [2] [emphasis added]). The statute further provides that this procedure "must be followed in any case where it appears that a defendant who stands convicted of a felony has previously been convicted of a predicate felony . . ." (id. § 400.21 [1] [emphases added]). Rudolph compels the conclusion that this type of mandatory language prohibits the People from agreeing not to file a predicate felon statement as part of a plea bargain. Further evincing the legislature's intent to make such procedures unwaivable in plea negotiations, the legislature enacted a provision, CPL 220.35, specifically to govern predicate felon hearings when a defendant pleads guilty. In the DVSJA, by contrast, the legislature did not use similarly mandatory language or enact any provision to govern DVSJA eligibility hearings held in connection with guilty pleas.

Footnote 4

CPL 245.25 (2) was approved in Senate and Assembly votes occurring, respectively, on March 31, 2019, and April 1, 2019, and the DVSJA was approved in Assembly and Senate

votes on, respectively, March 4, 2019, and March 12, 2019 (see Bill Jacket, L 2019, ch 59 [Part LLL], at 36; Bill Jacket, L 2019, ch 31, at 2-4).

Footnote 5

Given this, I will leave it to the reader to decide whether it is me, or the plurality, who refuses to "grapple with the DVSJA's statutory framework . . . in any meaningful way" (see plurality op at 16).

Footnote 6

Likewise, the plurality does not appear to dispute that a defendant can withdraw their request for a DVSJA hearing if, upon further reflection, they decide they do not want to put themselves through the intrusive hearing process. In the plurality's view, it seems, there is a difference between a defendant choosing not to proceed with a DVSJA hearing for personal reasons, and a defendant choosing not to do so for the strategic reason of obtaining a favorable plea deal. That is paternalism of the highest order, and there is no basis in the statute or legislative history for such a distinction.

Footnote 7

Plea bargaining is not mentioned a single time in either the Assembly or Senate debate transcripts, or in any of the letters and memoranda in the bill jacket for the DVSJA. In contrast, it was stressed multiple times during the debates on the bill that the opportunity afforded in the DVSJA is discretionary in nature (see Assembly Debate at 12-13, 17-18). This is not by any objective measure a legislative history that evinces an intent or a public policy to preclude the waiver of a statutory right in plea bargaining.

Footnote 8

Because part of the consideration for defendant's plea was her waiver of a DVSJA hearing, the People must be afforded the opportunity to withdraw their plea offer before any hearing is held on remand. Had defendant not agreed to spare the People and the court the resources of litigating the hearing, it is possible that the terms of the plea would have been less favorable to her.